**TOUSLEY BRAIN STEPHENS PLLC**
Kim D. Stephens, P.S. (OR 030635)
kstephens@tousley.com
Joan M. Pradhan (WA 58134)
jpradhan@tousley.com
1200 5th Avenue, Suite 1700,
Seattle, WA 98101
Telephone: (206) 667-0249

**LYNCH CARPENTER LLP**
Todd D. Carpenter (CA 234464)
todd@lcllp.com
Matthew J. Zevin (CA 170736)
mattz@lcllp.com
Scott G. Braden (CA 305051)
scott@lcllp.com
James B. Drimmer (CA 196890)
jim@lcllp.com
1234 Camino Del Mar
Del Mar, California 92014
Telephone:     (619) 762-1900
Facsimile:     (858) 313-1850

*Attorneys for Plaintiff and*
*Proposed Class Counsel*

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## [PORTLAND DIVISION]

| | |
|---|---|
| ANN BOOTH, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>CARTER'S, INC. a Delaware corporation, and DOES 1-50, inclusive,<br><br>Defendants. | Case No.:  3:24-cv-1341<br><br>**CLASS ACTION COMPLAINT**<br><br><br>**[DEMAND FOR JURY TRIAL]** |

Plaintiff Ann Booth ("Plaintiff") brings this action, on behalf of herself and all others similarly situated, against Defendant Carter's, Inc. ("Carter's" or "Defendant") and states:

## I.  NATURE OF ACTION

1.  "Protection of unwary consumers from being duped by unscrupulous sellers is an exigency of the utmost priority in contemporary society." *Vasquez v. Superior Court*, 4 Cal. 3d 800, 808 (1971). This principle is as true today as it was over 50 years ago when it was penned by Justice Mosk writing for a unanimous California Supreme Court. This putative class action is about holding a multimillion-dollar company accountable to its customers who have been deceived by a years-long campaign to trick them into paying more for Carter's merchandise through the widespread and perpetual use of false reference and discount pricing. "In short, the higher reference price stated alongside the selling price shift[s] the demand function outward, leading to higher average prices and thus higher margins." Staelin, *et al*., *Competition and the Regulation of Fictitious Pricing*, 87 J. Mktg., 826, 835 (2023) ("Staelin").

2.  Prices reflect a perceived value to consumers.[1] False advertising of prices can be used to manipulate consumers' value perception of products and cause consumers to overpay for them. Aware of the intertwined connection between consumers' buying decision processes and price, retailers like Defendant lure consumers with advertised discounts that promise huge savings and high value. But the promised savings are false, and the product's value reflected in its price is

---

[1] Dhruv Grewal & Larry D. Compeau, *Comparative Price Advertising: Informative or Deceptive?*, 11 J. PUB. POL'Y & MKTG. 52, 55 (1992) [hereinafter Grewal & Compeau, *Comparative Price Advertising*] ("[P]rice is materially utilized in the formation of perceptions of the product's value and influences the decision to purchase the product or to continue to search for a lower price."); Patrick J. Kaufmann et al., *Deception in Retailer High-Low Pricing: A "Rule of Reason" Approach*, 70 J. RETAILING 115, 118 (1994) ("[R]eference to a retailer's normal or regular price in retail sale price advertising provides the consumer with information used to determine perceived value").

incorrect when the retailer advertises discounts off of some higher, made-up, and artificially inflated "original" price that no one ever pays.

3.      At all relevant times, Defendant has continually advertised false price discounts for its infant and young children's apparel sold throughout its Carter's stores and on its website, carters.com. In bringing this putative class action complaint, Plaintiff seeks to remedy this deception and its attendant harm to consumers. Plaintiff seeks monetary damages, restitution, and declaratory and injunctive relief from Defendant arising from its false discounting scheme.

4.      False reference pricing occurs when a seller fabricates a false "original" price for a product and then offers that product at a substantially lower price under the guise of a discount. The resulting artificial price disparity misleads consumers into believing the product they are buying has a higher market value, and it induces them into purchasing the product. This practice artificially inflates the market price for these products by raising consumers' internal reference price and in turn the perceived value consumers ascribe to these products (i.e., demand).[2] Consequently, false reference pricing schemes enable retailers, like Defendant, to sell products above their true market price and value, leaving consumers to pay the inflated price regardless of what they thought of the purported discount. Consumers are thus damaged not only by not receiving the promised discount, but by paying a premium the products would not have commanded but for the false reference pricing scheme.

5.      The following example of a hypothetical DVD seller, which parallels Defendant's practice, illustrates how false reference pricing schemes harm consumers: the seller knows it can sell a particular DVD at $5.00, which represents both the market price and the price at which the

---

[2] Grewal & Compeau, *Comparative Price Advertising*, *supra* n.1, at 55 ("By creating an impression of savings, the presence of a higher reference price enhances subjects' perceived value and willingness to buy the product.").

seller could regularly make a profit. Instead, however, the seller creates a fake "original" price for the DVD of $100.00 and advertises the DVD as "on sale" at 90% off, creating a (fake) "sale" price of $10.00. Consumers purchase the DVD for $10.00 believing they got a "good deal" since it was previously sold—i.e., valued by others in the market—at an "original" price of $100.00, and presumably would be again soon.

6.     The consumer's presumption and purchase stem directly from the seller's deception. If the seller did not employ a false referencing pricing scheme, it would not be able to sell many, if any, DVDs at $10.00 because the true market value of the DVD is $5.00. However, the false reference pricing scheme enables the seller to fabricate an increase in consumer demand for the DVD through the reasonable, but incorrect, **perceived value** of the DVD ($100.00) in connection with the substantial discount of $90.00. The net effect of myriad consumers' increased willingness to pay $10.00 for the DVD. Thus, the seller artificially inflates the market price for the DVD to $10.00 by advertising the false "original" price and corresponding fake discount.

7.     Through its false and misleading marketing, advertising, and pricing scheme alleged herein, Defendant violated, and continues to violate, Oregon and federal law. Specifically, Defendant violated and continues to violate: Oregon's Unlawful Trade Practices Act ("UTPA"), Or. Rev. Stat. § 646.605, *et seq.*; and the Federal Trade Commission ("FTC") Act ("FTCA"), which prohibits "unfair or deceptive acts or practices in or affecting commerce" (15 U.S.C. § 45(a)(1)) and false advertisements (15 U.S.C. § 52(a)).

8.     Plaintiff brings this action on behalf of herself and other similarly situated consumers who have purchased one or more of Defendant's products advertised at a purported discount from a fictitious higher reference price from Carter's brick and mortar stores or from its website, carters.com. Plaintiff intends to halt the dissemination and perpetuation of this false,

misleading, and deceptive pricing scheme, to correct the false and harmful perception it has created in the minds of consumers, and to obtain redress for those who overpaid for merchandise tainted by this deceptive pricing scheme. Plaintiff also seeks to permanently enjoin Defendant from engaging in this unlawful conduct. Further, Plaintiff seeks to obtain all applicable damages, including actual, compensatory, benefit of the bargain, statutory, and punitive; equitable restitution; reasonable costs and attorneys' fees, and other appropriate relief in the amount by which Defendant was unjustly enriched as a result of its sales of merchandise offered a false discount.

## II.     JURISDICTION AND VENUE

9.      This Court has original jurisdiction over the subject matter of this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and Plaintiff, and at least some members of the proposed Class (defined below), have a different state citizenship from Defendant.

10.     The District of Oregon has personal jurisdiction over Defendant because Defendant is a corporation or other business entity which does conduct business in the State of Oregon. Defendant conducts sufficient business with sufficient minimum contacts in Oregon, and/or otherwise intentionally avails itself to the Oregon market through the operation of the Outlets within the State of Oregon.

11.     Venue is proper under 28 U.S.C. § 1391(b)(2) because Defendant transacts substantial business in this District and a substantial part of the events giving rise to Plaintiff's claims arose here.

### III.    GENERAL ALLEGATIONS

**A.    Retailers Benefit from False Reference Pricing Schemes.**

12.    Defendant engages in a false and misleading reference price scheme in the marketing and selling of its merchandise at its stores and e-commerce website, carters.com.

13.    Retailers like Defendant can and do benefit substantially from false discounting schemes because "framing a price increase as a discount can not only allow the firm to get ***higher margins***, but also ***increase sales***." Staelin, *et al.*, *supra*, at 835 (emphasis added). This is because consumers use advertised reference prices to make purchase decisions, particularly when the information available to consumers can vary among different types of products.[3] Most often, as with retail clothing, consumers lack full information about the products and, as a result, often use information from sellers to make purchase decisions.[4]

14.    Defendant's deceptive advertised reference prices are thus incorporated into consumers' decision process. First, a product's "price is also used as an indicator of product quality."[5] In other words, consumers view Defendant's deceptive advertised reference prices as a

---

[3] Even within a product, consumers may have imperfect information on the individual attributes. Economists describe "search goods" as those whose attributes "can be ascertained in the search process prior to purchase" (e.g., style of a shirt), "experience goods" as those whose attributes "can be discovered only after purchase as the product is used" (e.g., longevity of a shirt), and "credence goods" as those whose attributes "cannot be evaluated in normal use" (e.g., whether the shirt's cotton was produced using organic farming methods). Michael R. Darby & Edi Karni. *Free Competition and the Optimal Amount of Fraud*, 16 no. 1 J. Law & Econ. 67, 68-69 (1973).

[4] "Not only do consumers lack full information about the prices of goods, but their information is probably even poorer about the quality variation of products simply because the latter information is more difficult to obtain". Phillip Nelson. *Information and Consumer Behavior*. 78, no. 2 J. Pol. Econ. 311, 311-12 (1970).

[5] Grewal & Compeau, *Comparative Price Advertising*, *supra* n.1, at 54; *see also* Richard Thaler. *Mental Accounting and Consumer Choice*, 4, no. 3 Mktg. Sci. 199, 212 (1985) [hereinafter Thaler, *Mental Accounting and Consumer Choice*] ("The [reference price] will be more successful as a reference price the less often the good is purchased. The [reference price] is most likely to serve

proxy for product quality. Second, reference prices "appeal[] to consumers' desire for bargains or deals."[6] Academic researchers note how consumers "sometimes expend more time and energy to get a discount than seems reasonable given the financial gain involved," and "often derive more satisfaction from finding a sale price than might be expected on the basis of the amount of money they actually save."[7] Under this concept, coined as "transaction utility" by Nobel Prize-winning economist Richard Thaler, consumers place value on the psychological experience of obtaining a product at a perceived bargain.[8]

15.     Research in marketing and economics has long recognized that consumer demand can be influenced by "internal" and "external" reference prices.[9] Internal reference prices are "prices stored in memory" (e.g., a consumer's price expectations adapted from past experience) while external reference prices are "provided by observed stimuli in the purchase environment" (e.g., a "suggested retail price," or other comparative sale price).[10] Researchers report that consumers' internal reference prices adjust toward external reference prices when valuing a

---

as a proxy for quality when the consumer has trouble determining quality in other ways (such as by inspection)").

[6] Grewal & Compeau, *Comparative Price Advertising*, *supra* n.1, at 52.

[7] Peter Darke & Darren Dahl. *Fairness and Discounts: The Subjective Value of a Bargain*, 13 no 3 J. OF CONSUMER PSYCH. 328 (2003).

[8] "To incorporate . . . the psychology of buying into the model, two kinds of utility are postulated: *acquisition utility* and *transaction utility*. The former depends on the value of the good received compared to the outlay, the latter depends solely on the perceived merits of the 'deal.'" Richard Thaler. *Mental Accounting*, *supra* n.6, at 205.

[9] Empirical results "suggest that internal reference prices are a significant factor in purchase decisions. The results also add empirical evidence that external reference prices significantly enter the brand-choice decision." Glenn E. Mayhew & Russell S. Winer. *An Empirical Analysis of Internal and External Reference Prices using Scanner Data*, 19 no. 1 J. OF CONSUMER RSCH. 62, 68 (1992) [hereinafter Mayhew & Winer, *An Empirical Analysis*].

[10] Mayhew & Winer, *An Empirical Analysis*, *supra* n.10, at 62.

product.[11] For infrequently purchased products, external reference prices can be particularly influential because these consumers have little or no prior internal reference.[12] In other words, "[t]he deceptive potential of such advertised reference prices are likely to be considerably higher for buyers with less experience or knowledge of the product and product category."[13] Academic literature further reports that "there is ample evidence that consumers use reference prices in making brand choices"[14] and publications have summarized the empirical data as follows:

> Inflated reference prices can have multiple effects on consumers. They can increase consumers' value perceptions (transaction value and acquisition value), reduce their search intentions for lower prices, increase their purchase intentions, and reduce their purchase intentions for competing products … Inflated and/or false advertised reference prices enhance consumers' internal reference price estimates and, ultimately, increase their perceptions of value and likelihood to purchase[.][15]

16.    In Staelin, published just last year, authors Richard Staelin, a Duke marketing professor since 1982, Joel Urbany, a Notre Dame marketing professor since 1999, and Donald

---

[11] "Buyers' internal reference prices adapt to the stimuli prices presented in the advertisement. That is, buyers either adjust their internal reference price or accept the advertised reference price to make judgments about the product's value and the value of the deal." Dhruv Grewal et al., *The Effects of Price-Comparison Advertising on Buyers' Perceptions of Acquisition Value, Transaction Value, and Behavioral Intentions.* 62 J. OF MKTG. 46, 48 (1998) [hereinafter Grewal *et al.*, *The Effects of Price-Comparison Advertising*].

[12] As Thaler notes, "the [suggested retail price] will be more successful as a reference price the less often the good is purchased." Richard Thaler. *Mental Accounting*, *supra* n.6, at 212.

[13] Dhruv Grewal & Larry D. Compeau. *Pricing and public policy: A research agenda and an overview of the special issue*, 18 no.1 J. PUB. POL'Y & MKTG. 3, 7 (1999) [hereinafter Grewal & Compeau, *Pricing and public policy*].

[14] Gurumurthy Kalvanaram & Russell S. Winer. *Empirical Generalizations from Reference Price Research*. 14, no. 3 MKTG. SCI. G161 (1995); *see also* Jerry B. Gotlieb & Cyndy Thomas Fitzgerald. *An Investigation into the Effects of Advertised Reference Prices on the Price Consumers are Willing to Pay for the Product*. 6 no. 1 J. OF APPLIED BUS. RSCH. 59, 65-66 (1990) [hereinafter Gotlieb & Fitzgerald, *An Investigation*] ("The results of this research provide support for the position that [external] reference prices are important cues consumers use when making the decision concerning how much they are willing to pay for the product.").

[15] Grewal & Compeau, *Pricing and public policy*, *supra* n.14, at 7.

Ngwe, a senior principal economist for Microsoft and former marketing professor for Harvard, built on their prior analytic work to explain the effects of false reference pricing schemes and why their use has not dissipated as previously expected by the FTC, but rather have become more prevalent in the absence of FTC regulation. Importantly, this new study cites and confirms many of the same older consumer studies cited above[16] and notes that the findings of these "older" studies are still widely accepted relevant principles in the economic discipline. *See id.*

17.    Additionally, Staelin explains how the modern development of consumer search behavior and options available to consumers (e.g., smartphones, online shopping) has actually *spread* the presence of fictitious reference pricing, not extinguished it.[17] According to Staelin and his co-authors, "disclosure of the true normal price charged may be the only solution that could plausibly influence both consumer and firm behavior." *Id.* at 826. *See also id.* at 831 ("Identical firms, selling identical products, make positive profits because of their obfuscation strategy, and the likelihood of obfuscation grows as competition intensifies.").

18.    Consequently, retailers like Defendant, who understand that consumers are susceptible to a bargain, have a substantial financial interest in making consumers think they *are* getting a bargain, even when they are not. Contrary to the illusory bargains in Defendant's advertisements, consumers are not receiving *any* discount and are actually *overpaying* for Defendant's product because, as Staelin, *et al.* put it, "[t]he magnitude of both real and fake discount[s] were significant predictors of demand above the effects of the actual sales price, **with fake discounts having a substantially larger effect than real discounts**.") *Id.* at 835 (emphasis added).

---

[16]*See* Staelin, *et al., supra*, at 826 ("<u>It is now well accepted</u> that many consumers get extra utility, beyond that associated with consuming a product from purchasing it on deal [] and that magnitude of this utility is a function of the size of the deal.") (emphasis added).

[17] Staelin, *et al*.,*supra*, at 826. (explaining how the study "develop(s) a descriptive model explaining why fictitious reference pricing has spread instead of being extinguished by competition.").

**B.    Defendant Engages in a Fraudulent Price Discounting Scheme.**

19.    Defendant is a specialty retailer of apparel for infants and young children. For years, it has engaged in a fake discounting scheme that harms consumers by advertising its merchandise at discounted "sale" prices in its stores and on its e-commerce website, carters.com. In short, Defendant attaches price tags ("ticket prices") to its merchandise intended to represent the "original" former price at which Defendant sold its products both in its brick-and-mortar stores and on its website, carters.com. Although the ticket prices use the term "MSRP" next to the price, they also include a supposed "Date of Birth" ("DOB") that Defendant claims was the date that it supposedly began offering the product at its full ticket price. The ticket prices also reference the website, carters.com, thus giving the impression that the same merchandise is available for the same price on Defendant's website.

20.    In its stores, Defendant aggressively markets deep discounts from the advertised ticket prices primarily through placard signage resting on or attached to the product rack or shelf where the merchandise is located. The signs are printed in an eye-popping red or blue-and-white color scheme, boldly emphasizing a deep discount framed as "___% Off" the associated ticket price(s).[18]

21.    The photos below shows representative examples of Defendant's storewide practice of advertising discounts in its brick and mortar stores.[19]

---

[18] The advertised discounts typically range between 40% to 60% off the ticket price.

[19] See **Exhibit A**, additional Carter's in-store photographs depicting the extent and prevalence of discount signage throughout the store.



22.    Similarly, on its website, carters.com, Defendant advertises the same discounts by placing a line through the ticket price (a "strikethrough"), as well as a representation of the

purported "% off" (e.g., 50% off) next to the purportedly discounted price that is displayed in

large, bold text: [20]



---

[20] Attached hereto as **Exhibit B** are numerous snapshots from carters.com depicting falsely discounted merchandise. Attached as **Exhibit C** are numerous snapshots of the website acquired from the Wayback Machine ("WBM").

WBM (accessible at https://wayback-api.archive.org/) is a well-regarded internet archive of websites and webpages as they existed at one point in time. In other words, while a website may update its content periodically, WBM permits users to view it exactly as it appears on the date the page snapshot is taken.

The date of the snapshot is shown at the top of each page.



23.    Most products offered on the website also have a small information tab which, if clicked, leads to a purported "Disclaimer" that states:

DOB [mo/year]

Many of our collections have a DOB (Date of Birth) on the price tag or on their website product page. This is the date that this item or a similar item was originally offered for sale at the MSRP.

MSRP is our Manufacturer's Suggested Retail Price at which we suggest our collections be initially offered. We list an MSRP on our products that we sell ourselves and that sell through our wholesale partners. Our wholesale partners are free to use our MSRP or set a different selling price, actual sales may or may not have been made at MSRP in any certain area or in all areas. Prices may vary by channel or location.[21]

---

[21] Carter's sells certain product lines through certain wholesale partners, such as JCPenney and Target, but according to Carter's Form 10-k filed with the Securities and Exchange Commission, it appears that those products are "exclusive" branded merchandise made exclusively for the wholesalers, meaning they are not the exact same products sold in Carter's stores or on its website. In other words, based on the Form 10-k, Plaintiff alleges that the products available at Carter's stores and on its website are **only** offered and available for purchase through those two channels, and not through Carter's wholesale partners.

24.     Thus, Defendant represents that the exact same (or similar) item "**was originally offered for sale at [the ticket price]**" on the DOB. In other words, Defendant affirmatively represents that its ticket prices are not just "suggested" prices, but rather, they are **actual, bona fide former** prices at which Defendant offered the product for sale in the recent past.

25.     The products sold at Defendant's brick and mortar stores are the same products offered on the carters.com website.

26.     In reality, at both the brick-and-mortar Carter's stores and on the carters.com website, the products are hardly, if ever, offered for sale, let alone actually sold, at the stated ticket prices. Instead, those prices are used solely to induce consumers to make purchases and spend money under the reasonable, but incorrect, belief that the merchandise was previously offered and sold at the reference price for a reasonably substantial period of time.

27.     Thus, even if Defendant did previously offer its merchandise at the full ticket price for some short period of time, (something Defendant rarely, if ever does), that limited offering would do little to legitimize Defendant's practice. *See e.g.,* 16 C.F.R. § 233.1(a) (requiring that a comparison reference price be the "price at which the article was offered to the public *on a regular basis for a reasonably substantial period of time*.") (emphasis added); *see also* 16 C.F.R. § 233.3(a) ("To the extent that list or suggested retail prices do not in fact correspond to prices at which a substantial number of sales of *the article in question* are made, the advertisement of a reduction may mislead the consumer.") (emphasis added); 16 C.F.R. § 233.3(d) ("[I]f the list price is significantly in excess of the highest price at which substantial sales in the trade area are made, there is a clear and serious danger of the consumer being misled by an advertised reduction from this price.").

28.     In sum, Defendant's fake discount scheme does not comply with the law and is intended to increase sales while depriving consumers of the benefit of their bargain.[22] Indeed, this conduct deprives consumers of a fair opportunity to fully evaluate the offers and to make purchase decisions based on accurate information. Nowhere in Defendant's stores or on its website does Defendant disclose that its ticket prices are **not**: (1) actual, bona fide former prices; (2) recent, regularly offered former prices; or (3) prices at which identical (or even substantially similar) products are regularly sold in the market. Nor does Defendant disclose the dates on which its ticket prices last prevailed in the market; nor could it because its ticket prices were never the prevailing price for any substantial period of time.[23]  The omission of these material disclosures, coupled with Defendant's use of fake reference and sale prices renders Defendant's pricing scheme inherently misleading to reasonable consumers, like Plaintiff, who have no way meaningful way of discerning that Defendant's pricing representations are illegal without substantial, time-consuming, and costly investigation before *every* purchase.

---

[22] Staelin *et al.*, *supra*, at 826 ("It is now well accepted that many consumers get extra utility, beyond that associated with consuming a product, from purchasing it on deal [] and that the magnitude of this utility is a function of the size of the deal.").

[23] To the extent Defendant contends that its "DOB" descriptor somehow brings it into compliance with the UTPA and/or FTCA, this argument fails for at least two additional reasons. First, the term "DOB" is meaningless to consumers who do not search Defendant's website, but "it is unrealistic for Defendant[] to expect consumers to pull out their smart phones and search the retailer's website for a definition [while they are shopping.]" *Chester v. TJX Companies, Inc.*, No. 515CV01437ODWDTB, 2016 WL 4414768, at *11 (C.D. Cal. Aug. 18, 2016). Second, the already-vague "DOB" term provides only a month and year, but not the day that the reference price was actually used. *See, e.g.,* Cal Bus. & Prof. Code § 17501 (requiring "the date when the alleged former price did prevail [to be] ***clearly, exactly and conspicuously*** stated in the advertisement."). Lastly, on information and belief, Plaintiff alleges that most Carter's new merchandise is offered at a discount the moment it hits the floor.

**C.      Defendant's Fraudulent Price Discounting Scheme Harms All Consumers.**

29.      A product's reference price matters because it serves as a baseline upon which consumers perceive its value.[24] Empirical studies "suggest that consumers are likely to be misled into a willingness to pay a higher price for a product simply because the product has a higher reference price."[25] Consumers are misled and incorrectly overvalue Defendant's products as a result of the false price comparisons. The products' actual sales prices, therefore, reflect consumers' overvaluation of them, which in turn permits Defendant to command inflated prices for them beyond what the market would otherwise allow. As discussed above, academic researchers have documented the relationship between reference prices and consumer behavior, as well as the resulting harm from *false* reference prices:

> [A]dvertised reference prices in these deal-oriented advertisements can enhance buyers' internal reference prices . . . . These enhanced internal reference prices, when compared with the lower selling price, result in higher transaction value perceptions. The increase in perceived transaction value enhances purchases and reduces search behavior for lower prices. If sellers intentionally increase the advertised reference prices above normal retail prices, this is, inflate advertised reference prices, the resulting inflated perceptions of transaction value would be deceptive. Harm to both buyers and competitors could result from the effect of the inflated transaction value on buyers' search and purchase behaviors.[26]

30.      Accordingly, all consumers who purchase Carter's merchandise are harmed by Defendant's pricing scheme because its impact pervades the entire market for Defendant's merchandise. This is because, again, the artificially increased demand generated by Defendant's pricing scheme results in increased actual sales prices beyond what the products would command

---

[24] Thaler, *Mental Accounting and Consumer Choice*, *supra* n.6, at 212.

[25] Gotlieb & Fitzgerald, *An Investigation*, *supra* n.15, at 66. Moreover, "if a higher reference price encourages consumers to pay a higher price for a product than the consumer was willing to pay for the identical product with a lower reference price, then the practice of using high reference prices would be deceptive." *Id*. at 60.

[26] Dhruv Grewal et al., *The Effects of Price-Comparison Advertising*, *supra* n.12, at 46.

in the absence of the false reference pricing scheme. Again, "the higher reference price stated alongside the selling price shift[s] the demand function outward, leading to higher average prices and thus higher margins." Staelin *et al*., *supra*, at 835. Thus, all Carter's shoppers pay more regardless of their individual beliefs or purchasing decision processes. In other words, their subjective beliefs about the value of the products or the legitimacy of the purported discounts are inconsequential to the injury they incur when purchasing Defendant's merchandise. All consumers who purchase falsely discounted Carter's products have overpaid because they have paid a premium for merchandise that is worth less than its actual sales price.

31.    Fundamental economics concepts and principles dictate that the harm caused by Defendant's scheme is uniformly suffered by deceived and, to the extent there are any, non-deceived shoppers alike. One such principle is that cost and demand conditions determine the market prices paid by all consumers.[27] The aggregate demand curve for a product, including Defendant's products, represents consumers' valuation of that product as a whole; as consumers' valuation increases, the demand curve shifts outward. When the aggregate demand curve of a product shifts outward, its market price will increase. Therefore, a specific individual's willingness to pay a certain price for a product will not negate how market prices, as determined by aggregate demand, dictate what all consumers purchasing a given product will pay.

32.    As a result, Defendant's pricing scheme impacts the market prices of its products, and any one individual consumer's subjective beliefs or idiosyncratic rationales will not isolate them from the resultant artificial and illegitimate inflation in Carter's prices. Economic theory ensures that as the aggregate demand curve for the products moves outward, all consumers are

---

[27] Mankiw, N. *Essentials of Economics*, 8th Edition. Boston, MA: Cengage Learning, 66 (2015) ("[P]rice and quantity are determined by all buyers and sellers as they interact in the marketplace"); *see also* Hal R. Varian, *Microeconomics Analysis*. 3rd Edition. New York, NY: W. W. Norton & Company, at 23-38, 144-57, 233-353 & 285-312 (1992).

forced to pay a higher price than the products would command absent the fake discounting scheme. Plaintiff and proposed Class (defined below) members thus suffered a common impact from Defendant's misconduct.

###    D.    Investigation

33.    Plaintiff's counsel has conducted a large-scale, comprehensive investigation into Defendant's fake discounting scheme at its Carter's stores and online at carters.com. Plaintiff's counsel tracked items at carters.com independently from approximately May 24 to September 1, 2023, on a daily or near-daily basis. Indeed, everything offered on carters.com appears to be always, if not virtually always, advertised at discounts from higher reference prices. This confirmed allegations in Section III.B. above—that items for sale on carters.com are perpetually and uniformly priced with substantially "discounted" sale prices appearing next to both the "crossed out" (or "strikethrough") "original" price, next to the lower "sale" price. Attached hereto as **Exhibit D** is a summary of product tracking data collected by Plaintiff's counsel during 2023.

34.    Plaintiff's counsel also retained and deployed a preeminent computer programmer and non-testifying consulting expert to construct a data collection software application that monitored, ***on a daily basis***, Defendant's pricing practices for every product offered for sale from at least May of 2023 through February 2024 on carters.com. The process used to obtain the original and sale price for products on carters.com leveraged an open-source software library which is used for software test automation. Plaintiff's counsel's consultant developed a proprietary application utilizing the library that initiated a web browser, loaded the URL (carters.com), then inspected the content of the page, isolating each of the links to the product. The application crawled through each link, loading the pages one at a time and ultimately spanning the entire website. The application was designed to mimic what a search engine like Google does when it indexes a

website. Once it loaded each page, the application sought out each of the products that were on sale. When it identified a product on sale, the application would record all the information about that product—e.g., price, sale, date, URL—and take a screenshot of the product. The application would also take a screenshot of the entire webpage, top to bottom, for verification that the data was not made up or tampered with in any way. This application was run twice a day, every day, on three different servers in different geographic locations around the country. This data was later aggregated into a single database where a timeline of the sale price for each product could be established. This data collection conclusively demonstrates Defendant's products at carters.com are—just like its brick-and-mortar retail store products—constantly discounted on a rolling basis *See generally* **Exhibit E**, a sample of items identified as being discounted at the same reference and sale price for at least 95 days in a row.

35.     Plaintiff's counsel first observed Carter's Oregon in-store pricing in September 2023. Plaintiff's counsel then launched a formal investigation to track pricing at Carter's physical store locations in Oregon on March 13, 2024, which continues through the present. Plaintiff's counsel also tracked pricing in Carter's California stores from April 18, 2024 through the present, and has monitored Defendant's pricing in New York. Notably, on all observed occasions, all products observed remained "discounted" under the same, uniform pricing scheme[28] at all locations regardless of the state and year. Attached as **Exhibit F** to this complaint is a list of exemplary products tracked in Oregon. The only thing that changed was the advertised discount and/or reference price on certain merchandise. In other words, all items had price tags that were constantly "discounted" by in-store signage indicating a substantial percent off ("___% Off") or whole-price reduction discount.

---

[28] That is, the fake discounting scheme described above in Section III.B. has appeared uniformly implemented at each location. *See* **Ex. A**.

36.    Thus, the investigation confirms that the "original" or "price tag" reference price of the items Plaintiff purchased were never the actual selling prices of those items because they were never offered at those prices, but rather, consistent with Defendant's uniform scheme, continuously offered for sale at fake discount prices. The investigation confirmed that this was a pervasive, uniform, and systematic practice at Defendant's Carter's stores and online carters.com, as thousands of items remained continuously discounted throughout the investigation period, including those products purchased by Plaintiff. Indeed, the investigation indicated that Carter's merchandise is never offered for sale at its full "original" price—and certainly are not "on a regular basis for a reasonably substantial period of time," as required by the FCTA. *See* 16 C.F.R. § 233.1 ("[T]he former price is the actual, bona fide price at which the article was offered to the public on a regular basis for a reasonably substantial period of time"); 16 C.F.R. § 233.3 ("To the extent that list or suggested retail prices do not in fact correspond to prices at which a substantial number of sales of the article in question are made, the advertisement of a reduction may mislead the consumer.").

37.    Plaintiff's counsel also researched carters.com with the WBM. The website snapshots recorded by the WBM are consistent with the investigation. *See* **Ex. C.** The website snapshots recorded by the WBM showed discounted prices on  carters.com merchandise across several months before Plaintiff's purchases.

38.    Thus, the false discounting scheme used by Defendant on its Carter's branded merchandise is uniformly and identically applied on all, or virtually all, of the Carter's products sold through Defendant's Oregon brick-and-mortar stores and e-commerce website, carters.com.

39.    Despite Plaintiff's counsel's best efforts at investigation, the full extent of Defendant's false and deceptive pricing scheme can only be revealed through a full examination of records exclusively in Defendant's possession.

## IV.    PARTIES

**Plaintiff Ann Booth**

40.    Plaintiff resides in, and is a citizen of, Portland, Oregon. On June 6, 2024, Plaintiff visited and purchased several items from Defendant's store located at 3195 Southwest Cedar Hills Boulevard, Beaverton, Oregon 97005. Specifically, in reliance on Defendant's false and deceptive advertising, marketing and discount pricing scheme, Plaintiff purchased the following items:

| No. | Item: | "Original" Price: | Purported Discount: | Purchase Price: |
|---|---|---|---|---|
| 1 | Baby Snail Print Zip-Up PurelySoft Sleep and Play Pajamas (SKU 195862270606) | $24.00 | 40% Off | $14.40 |
| 2 | Baby Zip-Up PurelySoft Sleep and Play Pajamas (SKU 195862474691) | $24.00 | 40% Off | $14.40 |
| 3 | Baby 3-Piece Little Cardigan Set (SKU 195861911241) | $28.00 | 40% Off | $16.80 |

41.    During her time at the Carter's store, Plaintiff browsed several items before deciding on what to purchase. After reviewing and relying on the advertised sale price for the items listed above, and the signs advertising various "__% Off" discounts on items throughout the store, Plaintiff decided to purchase those items for personal and family use. In so doing, Plaintiff believed she was receiving a significant discount on the items, and that discounted prices were limited in time and would not last. She would not have purchased these items were it not for the significant bargain she thought she was receiving. On all products, the advertised discounts were a material representation to her, and she relied on them in making her purchase decision.  However, Plaintiff did not receive the benefit of her bargain and, in reality, paid more for the items than they were worth in the form of a premium as a result of the fake sale scheme.

42.    Plaintiff has therefore suffered economic injury as a direct result of Defendant's unlawful, unfair, and fraudulent false reference pricing scheme.

**Plaintiff's Economic Injuries Are Readily Quantifiable**

43.     Aside from the economic harm that Plaintiff suffered as a result of buying products she would not have bought absent Defendant's false discounting scheme, Plaintiff also suffered a readily quantifiable economic injury because she overpaid for each item purchased. And it was Defendant's false reference pricing scheme and attendant deception that caused Plaintiff to overpay. Despite Plaintiff's original beliefs that each item was discounted and thus that its value was significantly greater than the sale price paid for it, Plaintiff, in actuality, paid an *inflated* price for each item.

44.     That is, the items Plaintiff purchased were each worth less than the amount Plaintiff paid for them and if Defendant had not employed the falsely advertised "original" prices for the items, then they would not have commanded such a high, inflated price. The price premium Plaintiff paid—i.e., the difference between the amount Plaintiff paid and the value received, or the but-for price the product would have commanded absent the false discounting scheme, can be isolated through multiple expert-based models, including hedonic regression, conjoint analysis, and market simulation, which Plaintiff will further describe in her motion to certify this action as a class action pursuant to Fed. R. Civ. P. 23.

**Plaintiff Has Standing for Injunctive Relief and Lack an Adequate Remedy at Law**

45.     Plaintiff is also susceptible to the same harm reoccurring, and therefore requires an injunction, because she cannot be certain that Defendant will have corrected this deceptive pricing scheme, and she strongly desires to shop at Defendant's stores again because she likes the brand and the clothing styles offered. Due to the enormous, fluctuating variety of styles and sizes of merchandise offered at Defendant's stores, Plaintiff will be unable to parse what prices are inflated and untrue, and what prices are not. Plaintiff simply does not have the resources to ensure that

Defendant is complying with Oregon and federal law with respect to its pricing, labeling, and advertising of its merchandise.

46.     Further, because of the wide selection of merchandise available at Defendant's stores, and the likelihood that Defendant will develop and market additional merchandise items for sale, Plaintiff may again, by mistake, purchase a falsely discounted product at one of Defendant's stores under the reasonable, but false, impression that Defendant had corrected the scheme and that its reference price advertisement represented a *bona fide* former price at which the item was previously offered for sale by Defendant. However, without a substantial, time-consuming, and costly investigation, Plaintiff will have no way of knowing whether Defendant has deceived her again.

47.     Absent an equitable injunction enjoining Defendant from continuing in the unlawful course of conduct alleged herein, Plaintiff, members of the Class, and the public will be irreparably harmed and denied an effective and complete remedy because they face a real and tangible threat of future harm emanating from Defendant's ongoing and deceptive conduct that cannot be remedied with monetary damages. Accordingly, Plaintiff, members of the Class, and the general public lack an adequate remedy at law and an injunction is the only form of relief which will guarantee Plaintiff and other Oregon consumers the appropriate assurances.

48.     Moreover, Plaintiff lacks an adequate remedy at law with respect to her claims seeking damages because she has not yet retained an expert to determine whether an award of damages can or will adequately remedy her monetary losses caused by Defendant. Particularly, as legal damages focus on remedying the loss to the Plaintiff, and equitable restitution focuses wholly distinctly on restoring monies wrongly acquired by the defendant, legal damages are inadequate to remedy Plaintiff's losses because Plaintiff does not know at this juncture, and is certainly not

required to set forth evidence, whether a model for legal damages (as opposed to equitable restitution) will be viable or will adequately compensate Plaintiff's losses.[29]

**<u>Defendant</u>**

49.    Plaintiff is informed and believes, and upon such information and belief alleges, Defendant Carter's is a Delaware corporation with its principal executive offices in Atlanta, Georgia. It is, therefore, a dual citizen of Delaware and Georgia. Carter's owns and operates Carter's stores in Oregon, and throughout the United States, where it advertises, markets, distributes, and/or sells clothing and accessories for infants and young children.

50.    Plaintiff does not know the true names or capacities of the persons or entities sued herein as Does 1-50, inclusive, and therefore sue such defendants by such fictitious names. Plaintiff is informed and believes, and upon such information and belief alleges, that each of the Doe defendants is, in some manner, legally responsible for the damages suffered by Plaintiff and members of the proposed Class as alleged herein. Plaintiff will amend this complaint to set forth the true names and capacities of these defendants when they have been ascertained, along with appropriate charging allegations, as may be necessary.

51.    Defendant knows that its reference price advertising is false, deceptive, misleading, unconscionable, and unlawful under Oregon and federal law.

52.    Defendant fraudulently concealed from and intentionally failed to disclose to Plaintiff and other members of the proposed Class the truth about its advertised discount prices

---

[29] Similar allegations have been upheld in other false discount cases where the defendant has likewise challenged the plaintiff's ability to seek equitable relief following the decision in *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844 (9th Cir. 2020). *See, e.g., Dahlin*, 2020 WL 6647733, at *4-5; *Adams*, 2021 WL 4907248, at *3-4 (C.D. Cal. Mar. 1, 2021)*; Fallenstein*, No. 21-CV-01690-AJB-AGS (S.D. Cal. Jan. 3, 2023) at ECF No. 29 (Order Denying Defendants' Motion to Dismiss Plaintiff's First Amended Complaint). *Dahlin v. The Donna Karan Co. Store, LLC*, No. 2:21-cv-07711-AB-JPRx (C.D. Cal. Mar. 16, 2022) at ECF No. 30 (Order Denying Motion to Dismiss Plaintiff's First Amended Complaint) at 5-10

and former reference prices. Defendant concealed from consumers the true nature and quality of the products sold at its stores.

53.     Defendant intentionally concealed and failed to disclose material facts regarding the truth about false former price advertising in order to provoke Plaintiff and the proposed Class to purchase products in its stores.

54.     At all relevant times, Defendant has been under a duty to Plaintiff and the Class to disclose the truth about its false discounts.

## V.     CLASS ALLEGATIONS

55.     Plaintiff brings this action on behalf of herself and all other similarly situated Class members pursuant to Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure and seeks certification of the following Class against Defendant:

> All persons who, within the State of Oregon and within the applicable statute of limitations preceding the filing of this action (the "Class Period"), purchased from a Carter's store (in person or online) one or more products at discounts from an advertised reference price and who have not received a refund or credit for their purchase(s).

Excluded from the Class is Defendant, as well as its officers, employees, agents or affiliates, parent companies and/or subsidiaries, and each of their respective officers, employees, agents or affiliates, and any judge who presides over this action. Plaintiff reserves the right to expand, limit, modify, or amend this Class definition, including the addition of one or more classes, in connection with her motion for Class certification, or at any other time, based upon, *inter alia*, changing circumstances and/or new facts obtained during discovery.

56.     ***Numerosity***: The Class members are so numerous that joinder of all members is impracticable. Plaintiff is informed and believes that the proposed Class contains hundreds of thousands of individuals who have been damaged by Defendant's conduct as alleged herein. The precise number of Class members is unknown to Plaintiff.

57.    ***Existence and Predominance of Common Questions of Law and Fact***: This action involves common questions of law and fact, which predominate over any questions affecting individual Class members. These common legal and factual questions include, but are not limited to, the following:

a.    whether, during the Class Period, Defendant used falsely advertised reference prices on its product labels and falsely advertised price discounts on merchandise sold in its stores;

b.    whether Defendant ever offered items for sale or sold items at their advertised reference price and, if so, for how long;

c.    whether, during the Class Period, any of the original prices advertised by Defendant were false and/or misleading;

d.    whether Defendant made false or misleading representations of fact concerning the reasons for, existence of, or amounts of price reductions;

e.    whether Defendant's alleged conduct constitutes violations of federal and/or Oregon pricing regulations;

f.    whether Defendant engaged in an unconscionable commercial practice, and/or employed deception or misrepresentation under the laws asserted;

g.    whether Plaintiff and Class members are entitled to actual damages and the proper measure of that loss;

h.    whether Plaintiff and Class members are entitled to statutory damages pursuant to ORS § 646.638 *et seq.* and the proper measure of those damages; and

i.    whether an injunction is necessary to prevent Defendant from continuing to use false, misleading or illegal price comparisons.

58.    *Typicality*: Plaintiff's claims are typical of the claims of the Class members because, *inter alia*, all Class members have been deceived (or were likely to be deceived) by Defendant's false and deceptive price advertising scheme, as alleged herein. Plaintiff is advancing the same claims and legal theories on behalf of herself and all Class members.

59.    *Adequacy*: Plaintiff will fairly and adequately protect the interests of the Class members. Plaintiff has retained counsel experienced in complex consumer class action litigation, and Plaintiff intends to prosecute this action vigorously. Plaintiff has no antagonistic or adverse interests to those of the Class.

60.    *Superiority*: The nature of this action and the nature of laws available to Plaintiff and the Class make the use of the class action format a particularly efficient and appropriate procedure to afford relief to her and the Class for the wrongs alleged. The damages or other financial detriment suffered by individual Class members is relatively modest compared to the burden and expense that would be entailed by individual litigation of their claims against Defendant. It would thus be virtually impossible for Plaintiff and Class members, on an individual basis, to obtain effective redress for the wrongs done to them. Absent the class action, Class members and the general public would not likely recover, or would not likely have the chance to recover, damages or restitution, and Defendant will be permitted to retain the proceeds of its fraudulent and deceptive misdeeds.

61.    All Class members, including Plaintiff, were exposed to one or more of Defendant's misrepresentations or omissions of material fact claiming that former reference prices advertised prices were legitimate. Due to the scope and extent of Defendant's consistent false sale prices, advertising scheme, disseminated in a years-long campaign to consumers, it can be reasonably inferred that such misrepresentations or omissions of material fact were uniformly made to all

members of the Class. In addition, it can be reasonably presumed that all Class members, including Plaintiff, affirmatively acted in response to the representations contained in Defendant's false advertising scheme when purchasing merchandise sold at Defendant's stores.

62.    Plaintiff is informed that Defendant keeps extensive computerized records of its customers through, *inter alia*, customer loyalty programs, credit card programs, and general marketing programs. Defendant has one or more databases through which a significant majority of Class members may be identified and ascertained, and they maintain contact information, including email and home addresses, through which notice of this action could be disseminated in accordance with due process requirements.

### VI.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### Violation of Oregon's Unlawful Trade Practices Act ("UTPA")
### OR. REV. STAT. § 646.605, *et seq.*

63.    Plaintiff repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

64.    Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant for violations of the UTPA, ORS § 646.605 *et seq*.

65.    The UTPA is Oregon's principal consumer protection statute. As the Supreme Court of Oregon has explained:

> The civil action authorized by ORS 646.638 is designed to encourage private enforcement of the prescribed standards of trade and commerce in aid of the act's public policies as much as to provide relief to the injured party. This is apparent from the section itself. It allows recovery of actual damages or $200, whichever is greater, plus punitive damages, costs, and attorney fees. . . . The evident purpose is to encourage private actions when the financial injury is too small to justify the expense of an ordinary lawsuit . . . . the legislature was concerned as much with devising sanctions for the prescribed standards of trade and commerce as with remedying private losses, and that such losses therefore should be viewed broadly. The private loss indeed may be so small that the common law likely would reject it as grounds for relief, yet it will support an action under the statute.

*Weigel v. Ron Tonkin Chevrolet Co.*, 298 Or. 127, 134–36, 690 P.2d 488 (1984). A private plaintiff may also seek an injunction "as may be necessary to ensure cessation of unlawful trade practices." ORS § 646.636.

66.    Defendant is a "person," as defined by ORS § 646.605(4). Defendant is engaged in "trade" and "commerce" in Oregon by offering for sale goods with reference prices and discounts that directly or indirectly affect the people of Oregon, as defined by ORS § 646.605(8). The outlet products advertised by Defendant with reference prices and discounts are "goods" that are or may be obtained primarily for personal, family or household purposes, as defined by ORS § 646.605(6). Defendant's representations of reference prices and discounts in its outlet stores are "advertisements" as defined by ORS § 646.881(1). Defendant's use of reference prices and advertised discounts are "price comparisons" as defined by ORS § 646.881(2).

67.    Plaintiff and the Class members purchased the goods advertised by Defendant with reference prices and discounts for personal, family or household purposes.

68.    The unlawful methods, acts and practices pled herein were committed in the course of Defendant's business. ORS § 646.608(1).

69.    Defendant's unlawful methods, acts and practices pled herein were "willful violations" of ORS § 646.608 because Defendant knew or should have known that its conduct was a violation, as defined by ORS § 646.605(10).

70.    Defendant's reference prices are representations of Defendant's own "former prices," as defined by ORS § 646.885.

71.    Defendant's methods, acts and practices, including Defendant's misrepresentations, active concealment and failures to disclose, violated and continue to violate the UTPA in ways including, but not limited to, the following:

i.      Defendant represented its goods had characteristics or qualities that the goods did not have (specifically, Defendant represented that the goods had a value equal to the reference price, when in fact they did not and instead had a much lower true value) (ORS § 646.608(1)(e));

ii.     Defendant advertised its goods with intent not to provide the goods as advertised (specifically, Defendant represented that the goods had a value equal to the reference price, when in fact they did not and instead had a much lower true value—even lower than the "discounted" actual sales price) (ORS § 646.608(1)(i));

iii.    Defendant made false or misleading representations of fact concerning the reasons for, existence of, or amounts of price reductions (ORS § 646.608(1)(j));

iv.     Defendant engaged in price comparison advertising in violation of ORS § 646.883(2) by failing to comply with ORS § 646.608(1)(j) and ORS § 646.608(4) (ORS § 646.608(1)(ee));

v.      Defendant engaged in price comparison advertising in violation of ORS § 646.885(2) by using terms such as "____ percent discount," "$____ discount," "____ percent off" and/or "$____ off" where the reference price was not in fact Defendant's own former price (ORS § 646.608(1)(ee)); and

vi.     Defendant engaged in other unfair or deceptive conduct in trade or commerce, as described herein (ORS § 646.608(1)(u); ORS § 646.608(4)).

72.    With respect to omissions, Defendant at all relevant times had a duty to disclose the information in question because, inter alia: (a) Defendant had exclusive knowledge of material information that was not known to Plaintiff and the Class; (b) Defendant concealed material

information from Plaintiff and the Class; and/or (c) Defendant made partial representations which were false and misleading absent the omitted information.

73.    Defendant's misrepresentations and nondisclosures deceive and tend to deceive a reasonable consumer and the general public.

74.    Defendant's misrepresentations and nondisclosures are material, in that a reasonable person would attach importance to the information and would be induced to act on the information in making purchase decisions.

75.    Defendant engaged in the reckless or knowing use or employment of the unlawful methods, acts or practices alleged herein which have been declared unlawful by ORS § 646.608.

76.    As a direct, substantial and/or proximate result of Defendant's conduct, Plaintiff and the Class members suffered compensable and ascertainable losses.

77.    Plaintiff and the Class members would not have purchased the products at the prices they paid if they had known that the advertised reference prices and discounts were false.

78.    Defendant's false reference pricing scheme fraudulently increased demand from consumers. This fraud artificially raised consumer demand for Defendant's merchandise, thereby shifting the demand curve outward and enabled Defendant to charge higher prices than it otherwise could have charged.

79.    The products that Plaintiff and Class members purchased were not, in fact, worth as much as Defendant represented them to be worth, or the actual sales price that Plaintiff and Class members paid for them.

80.    Plaintiff seeks on behalf of herself and the Class: (1) the greater of statutory damages of $200 or actual damages for every violation of the act; (2) punitive damages;

(3) appropriate equitable relief, including injunctive and restitution, as appropriate; and (4) attorneys' fees and costs pursuant to ORS § 646.638 *et seq.*

81.     The unlawful acts and omissions pled herein were, are, and continue to be part of a pattern or generalized course of conduct. Defendant's conduct is ongoing and is likely to continue and recur absent a permanent injunction. Accordingly, Plaintiff seeks an order enjoining Defendant from committing such unlawful practices pursuant to ORS § 646.638(8)(c); ORS § 646.636.

82.     The balance of the equities favors the entry of permanent injunctive relief against Defendant. Plaintiff, the Class members and the general public will be irreparably harmed absent the entry of permanent injunctive relief against Defendant. Plaintiff, the Class members and the general public lack an adequate remedy at law. A permanent injunction against Defendant is in the public interest. Plaintiff is informed and believes and thereon alleges that Defendant's unlawful behavior is ongoing as of the date of the filing of this Complaint. If not enjoined by order of this Court, Defendant will or may continue to injure Plaintiff and Oregon consumers through the misconduct alleged herein. Absent the entry of a permanent injunction, Defendant's unlawful behavior will not cease and, in the unlikely event that it voluntarily ceases, it is capable of repetition and is likely to reoccur.

83.     Defendant's conduct has caused substantial injury to the general public. Plaintiff individually seeks public injunctive relief to protect the general public by putting an end to Defendant's false reference price advertising, false discounts and omissions.

84.     This action was brought "within one year after the discovery of the unlawful method, act or practice." ORS § 646.638(6). The applicable limitations period is expansive and extends back many years based on the "discovery" rule explicitly provided for in the Oregon Unlawful Trade Practices Act at ORS § 646.638(6). Defendant's unlawful false discounting

practices have been pervasive at its Oregon stores—and at the core of its marketing plan—for many years (the exact length of time will be subject to discovery and proof).

85.     Plaintiff and the Class members did not know, and could not have known, that these reference prices and discount representations were false. As the Oregon Supreme Court has explained, "[i]n general terms, a cause of action does not accrue under the discovery rule until the claim has been discovered or, in the exercise of reasonable care, should have been discovered." *FDIC v. Smith* 328 Or. 420, 428, 980 P.2d 141 (1999); *see also Saenz v. Pittenger*, 78 Or.App. 207, 211–12, 715 P.2d 1126 (1986) (UTPA statute of limitations begins running when plaintiff knows or should have known of the allegedly unlawful conduct).

86.     Plaintiff first learned of Defendant's false advertising scheme, and that she was likely a victim of the scheme, on or about June 20, 2024. Prior to that date, Plaintiff was not aware of Defendant's false discount advertising scheme and was not aware that the reference prices and discounts Defendant had previously advertised to her and upon which she had relied in purchasing her products were false. Even though Plaintiff became aware of Defendant's false advertising scheme on or about June 20, 2024, it stands to reason that all, or nearly all, other Class members are *still* unaware of Defendant's deception.

87.     By Defendant's design, its false advertising scheme by its very nature is hidden and virtually impossible for the typical consumer to discover. Consumers who shopped at Defendant's stores have no reasonable or efficient way of knowing the true daily price histories and past selling prices for the products they viewed and purchased without substantial, time-consuming, and costly investigation. Thus, Oregon consumers have, and for years have had, no way to know that the prices printed on the product price tags were fictitious and inflated and that the advertised discounts

were false. Consumers have, and for years have had, no way to know that Defendant's false

discounting practices extend across all, or virtually all, of Defendant's merchandise.

## VII.    PRAYER FOR RELIEF

Wherefore, Plaintiff, on behalf of herself and on behalf of the other members of the Class,

requests that this Court award relief against Defendant as follows:

1.    an order certifying the Class and designating Plaintiff as the Class

Representative and her counsel as Class Counsel;

2.    an order that the discovery rule, pursuant to, without limitation, ORS

§ 646.638(6), applies and that the applicable limitations period—and the corresponding

Class Period for the Class—extends back to the very first date that Defendant began

engaging in the unlawful conduct alleged herein;

3.    awarding restitution and disgorgement of all profits and unjust enrichment

that Defendant obtained from Plaintiff and the Class members as a result of its unlawful,

unfair, and fraudulent business practices described herein;

4.    awarding declaratory and injunctive relief as permitted by law or equity,

including: preliminarily and permanently enjoining Defendant from continuing the

unlawful practices as set forth herein, and directing Defendant to identify, with Court

supervision, victims of its misconduct and pay them all money they are required to pay;

5.    retaining jurisdiction to monitor Defendant's compliance with permanent

injunctive relief;

6.    awarding actual, punitive and statutory damages, as permitted under the

Oregon Unlawful Trade Practices Act;

7.    ordering Defendant to engage in a corrective advertising campaign;

8.    awarding attorneys' fees and costs;

9.    for leave to amend these pleadings to conform to evidence adduced at trial; and

10.    for such other and further relief as the Court may deem necessary or appropriate.

## VIII.   DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial for all claims so triable.

Dated: August 13, 2024        **TOUSLEY BRAIN STEPHENS PLLC**

By:   */s/ Kim D. Stephens*
      Kim D. Stephens, P. S. (OR 030635)
      kstephens@tousley.com
      Joan M. Pradhan
      jpradhan@tousley.com
      1200 5th Avenue, Suite 1700,
      Seattle, WA 98101
      Telephone:   (206) 667-0249

      **LYNCH CARPENTER LLP**
      Todd D. Carpenter (*pro hac vice* forthcoming)
      todd@lcllp.com
      Matthew J. Zevin (*pro hac vice* forthcoming)
      mattz@lcllp.com
      Scott G. Braden (*pro hac vice* forthcoming)
      scott@lcllp.com
      James B. Drimmer (*pro hac vice* forthcoming)
      jim@lcllp.com
      1234 Camino Del Ma r
      Del Mar, California 92014
      Telephone:   619.762.1910
      Facsimile:   858.313.1850

      *Attorneys for Plaintiff and*
      *Proposed Class Counsel*